| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |
| ------------------------------------------------------------x | |
| In re: | Chapter 11 |
| MARKETXT HOLDINGS CORP., | Case No. 04-12078 (ALG) |
|                           Debtor. | |
| ------------------------------------------------------------x | |

**MEMORANDUM OF DECISION**

A P P E A R A N C E S:

KAYE SCHOLER LLP
Attorneys for the Official Committee of Unsecured Creditors
   By:  Lester M. Kirshenbaum, Esq.
        Margarita Y. Ginzburg, Esq.
425 Park Avenue
New York, New York 10022

DENNER PELLEGRINO LLP
Attorneys for Empyrean Investment Fund L.P.,
 Rauf Ashraf, *et al.*
   By:  Robert Sinsheimer, Esq.
Four Longfellow Place
Boston, Massachusetts 02114


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

      This is another chapter in a long-running dispute between the representatives of

the Chapter 11 estates of Market XT Holdings Corp. ("Market XT") and Epoch

Investments, L.P. ("Epoch"), on the one hand, and Empyrean Investment Fund, L.P.

("EIF") and its affiliates and controlling partner, Rauf Ashraf ("Ashraf"), on the other.[1]

---

[1] EIF, Ashraf and their affiliates are hereafter sometimes referred to as the "EIF Parties." The Chapter 11 estates of Market XT and Epoch have been substantively consolidated, a liquidating Chapter 11 plan (the "Plan") has been confirmed for both entities and for an affiliate, Market XT Inc., and these parties are hereafter sometimes collectively referred to as the "Debtors." Under the Plan, causes of action are to be

The current dispute relates to the EIF Parties' claim that certain documents in the possession of attorneys they consulted—the Boston law firm of Bingham McCutchen LLP ("Bingham") and the California sole practitioner Mohammed I. Abdulla ("Abdulla")—are protected from disclosure by the attorney-client privilege. The Debtors and their representatives contend that the communications between the EIF Parties and their attorneys were in furtherance of a crime or fraud, that the documents evidencing these communications fall within the crime-fraud exception to the attorney-client privilege, and that they are not privileged from disclosure.

The Court held a hearing on the issues on November 18, 2008, at which the question was whether sufficient evidence existed that a crime or a fraud had been committed so as to establish "probable cause" for further *in camera* inspection of the allegedly privileged documents. Before a court may undertake such a review, the party asserting the crime-fraud exception must demonstrate a "factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *U.S. v. Zolin*, 491 U.S. 554, 572 (1989) (citation omitted). The ultimate question is whether "a prudent person [would] have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir. 1984).

Based on the record before it at the hearing, the Court delivered an oral ruling (Hr'g. Tr. 34:1-37:8, Nov. 18, 2008) that found probable cause for *in camera* review of the documents. The Court first noted that the attorney-client privilege is one of the most

---

pursued on behalf of the Debtors for the benefit of creditors by a Plan committee and a creditor representative, Alan Nisselson, who was the Chapter 11 trustee for the Debtors prior to Plan confirmation.

2

important and respected privileges in the law and has often been held to be "sacrosanct" (using the term propounded by counsel for the EIF Parties). Nevertheless, the Court continued, the crime-fraud exception is also well-recognized; in the words of Justice Cardozo, "There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States*, 289 U.S. 1, 15 (1933). *See also*, *Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416, 427 (S.D.N.Y. 2006); *U.S. v. Barrier Industries, Inc.*, 1997 WL 16668, *1 (S.D.N.Y. Jan. 17, 1997); *In re Andrews*, 186 B.R. 219, 222 (Bankr.E.D. Va. 1995); *In re Warner*, 87 B.R. 199, 201 (Bankr.M.D.Fla. 1988) (applying the crime-fraud exception in the fraudulent conveyance context, which is the principal claim against the EIF Parties).

The Court then found at the November 18th hearing that the Debtors' representatives had a reasonable basis to assert that a fraud had been committed or was contemplated in connection with the legal advice sought. It referred first to its finding that the principal of Market XT, Omar Amanat ("Amanat"), had entered into two transactions with the EIF Parties, in the amounts of $15.5 million and $13.2 million, respectively, with intent to "hinder, delay or defraud creditors" within the meaning of § 548(a)(1)(A) of the Bankurptcy Code. *See, In re Market XT Holdings Corp.*, 376 B.R. 390 (Bankr.S.D.N.Y. 2007). With respect to the $13.2 million transfer, the Court had in its opinion rejected the EIF Parties' defense of good faith and fair value and found them liable to the Market XT estate for $13.2 million as the transferee of an intentionally

3

fraudulent conveyance.[2] In response to the argument of the EIF Parties that the Court's earlier decision on summary judgment had been based on a finding of intent to hinder, and that the issue on the privilege question was intent to defraud, the Court concluded that the record was sufficient to establish reasonable grounds for a good faith belief that the legal advice had been sought by the EIF Parties in furtherance of fraudulent activity, particularly as Ashraf had admitted that he had procured from his lawyers and had used several backdated documents in connection with his defense of the fraudulent conveyance litigation.

The Court accordingly directed that the documents at issue be produced for *in camera* inspection so that it could make a ruling on the claim of privilege. The document production of the two law firms must be separately analyzed.

Documents Produced by the Bingham Firm

The Bingham firm produced more than 5,000 pages of documents for *in camera* inspection. The documents establish that the Bingham firm was introduced to the EIF Parties by a lawyer in California (not Abdulla), who had been contacted by a vice president of EIF, Samee Bhatti. The communications between the EIF Parties and a partner of the Bingham firm began on Christmas Eve, 2004, and continued until the representation substantially and abruptly concluded on or about April 8, 2005.

The timing of the commencement of the representation is critical as to the question whether the EIF Parties retained Bingham in furtherance of a fraud. Market XT,

---

[2] Judgment was entered against the EIF Parties for $13.2 million in connection with the second of the transactions, the so-called Collar transaction. The Court also found that Amanat had acted with the intent to hinder creditors in connection with an earlier transaction, the so-called STARS transaction, but it denied the motion for summary judgment on the ground that on the record before it, the EIF Parties had raised an issue of fact regarding the defense that they had provided value and that they had acted in good faith, and that the value they provided was reasonably equivalent value under the circumstances. Trial of these remaining issues has been scheduled for a later date.

4

formerly known as T. Corp., was a company owned and operated by Amanat and members of his family. Market XT had once had great success with an electronic system for trading securities but had deteriorated drastically by the winter of 2001-2002. On June 3, 2002, it had sold a wholly-owned subsidiary to E*Trade Financial Corp. ("E*Trade") for shares of E*Trade stock, but it was unable to liquidate the stock in order to meet the mounting demands of its creditors for payment.

In early 2003, Amanat enlisted the participation of Ashraf and the other EIF Parties in connection with the liquidation of the shares, and between June and September, 2003, Market XT entered into a series of transactions that, in substance, left the EIF Parties with the net proceeds of the E*Trade stock (approximately $28.7 million) and Market XT with nothing. On March 26, 2004, creditors of Market XT filed an involuntary petition against the company; Amanat disputed the filing for more than six months, but by the fall of 2004, his ability to delay was faltering. On December 1, 2004, Amanat finally consented to entry of a Chapter 11 order for relief against Market XT (Case No. 04-12078, ECF Doc. # 105); it was entered the next day. A creditors' committee was appointed on December 20, 2004 (ECF Doc. # 120), and on January 28, 2005, an independent Chapter 11 trustee was appointed to take over control of the estate (ECF Doc. # 192). Creditors were also pursuing judgments against Amanat personally as a party allegedly liable on certain of the Market XT debt, and he had engineered his own involuntary bankruptcy in the mistaken belief this would help fend them off.[3] An order for relief in Amanat's Chapter 7 case was ultimately entered on January 28, 2005 (Case No. 04-43361, ECF Doc. # 56).

---

[3] Amanat's actions in inducing his personal chauffeur to file an involuntary bankruptcy petition against him are described in this Court's opinion dated January 19, 2005, reported at 321 B.R. 30.

5

The creditors of Market XT had, months before, started an investigation into the transfer of the proceeds of the E*Trade stock to the EIF Parties. It appears that several of the creditors who filed the involuntary petition against Market XT in March 2004 had earlier filed a lawsuit in Massachusetts State court against Ashraf or EIF.[4] On January 4, 2005, the creditors' committee in the Chapter 11 case in this Court filed an application to take testimony pursuant to Bankruptcy Rule 2004 from several parties, including EIF, representing that the need for discovery had become apparent from earlier depositions of Amanat and a Market XT accountant. Ashraf retained Latham & Watkins LLP to represent him in connection with his production of documents and a deposition, and on January 13, 2005, that firm entered into a stipulation on his behalf that provided a schedule for document production and set the date of Ashraf's deposition as February 16, 2005.[5]

Bingham was not retained to represent Ashraf in connection with the bankruptcy proceedings, and as far as the documents reviewed *in camera* disclose, did not even know at the beginning that Market XT and Amanat were both in bankruptcy.[6] The initial documents merely refer to drafting. The California lawyer who turned the representation over to Bingham stated that the purpose of the representation would be to "tighten" documents evidencing EIF's purchase of Market XT's litigation rights in a potential lawsuit against E*Trade. (Docs. 00040-41, 00046 ). However, Ashraf's purpose soon

---

[4] EIF and the other EIF Parties are located in Boston, Massachusetts, as is the Bingham firm. There is a representation in papers filed in this case that an attorney for EIF had been contacted by the petitioning creditors in November, 2004, about a deposition of EIF in the Massachusetts case.

[5] Latham & Watkins was the first in a long series of counsel for the EIF Parties in these proceedings.

[6] When Bingham was first contacted, on December 24, 2004, Market XT was in Chapter 11 and an involuntary case had been filed against Amanat personally. As stated above, an order for relief was entered in the personal case on January 28, 2005.

6

became clear. As far as is shown in the documents, it is apparent that Bingham was initially retained for a different purpose—to create documents that could be falsified to evidence transactions that had never taken place or had taken place years before in a different form. Thus, one of Ashraf's first requests to the Bingham partner was for a document to evidence EIF's purchase of Amanat's personal damage claims against E*Trade. (Doc. 00156, dated Dec. 29, 2004). When Bingham began to draft a document to evidence such a purchase, it appears it did not know that the document would purportedly record a transaction that took place in 2003. (Doc. 0300). When the Bingham partner on the matter first learned this, apparently on or about January 2, 2005, he responded; "I am afraid that the current draft of the claims purchase agreement makes no sense given what you told me…if these were already done in 2003, should we just describe what was done…Why are we drafting new trading capital and trading agreements? What do we gain by having new agreements?" (Doc. 00347).

       The documentary record does not contain a clear answer to these questions or why Bingham spent the next three months drafting and redrafting documents that were supposed to reflect transactions that took place in 2003. Bingham has not had an opportunity to be heard, and it is not necessarily inappropriate for an attorney to document transactions that took place in the past and that are entered into "as of" a date in the past. The Court makes no finding herein that Bingham's actions were fraudulent or that it knew that the client intended to use its work to further a fraud or a crime. Bingham's intent or complicity is, however, irrelevant on the privilege issue. The question before the Court is whether the client consulted the attorney for the purpose of furthering a crime or fraud, and the issue is the client's state of mind. *See, e.g., Clark v.*

7

*United States*, 289 U.S. at 15; *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1038; *U.S. v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986), *cert. denied*, 475 U.S. 1109 (1986).

There is ample evidence on the record before the Court that Ashraf on behalf of the EIF Parties asked the Bingham firm to create documents to evidence transactions that either never took place in 2003 or that could not lawfully be doctored or "tightened" in 2005, and that an attempt to do so would constitute the furtherance of a fraud or crime. Thus, one of the first documents that Ashraf asked Bingham to draft was a claims purchase agreement evidencing EIF's alleged "purchase" of certain litigation claims by Market XT against E*Trade. By 2005, these litigation claims were the principal asset of the Market XT Chapter 11 estate.[7] Even if Bingham did not know about Market XT's bankruptcy, Ashraf certainly did, and he had to know that Amanat could not sign documents as principal of Market XT to evidence purported prepetition transactions. Ashraf also had to know that the EIF Parties were certain to be sued as the transferees of more than $27 million in alleged fraudulent conveyances. There can be no serious question that he intended to backdate and fraudulently use the documents, as Ashraf has admitted in connection with two of the documents. By letter dated May 9, 2006, on EIF's letterhead (Case No. 05-01268, ECF Doc. # 188), Ashraf wrote to inform the Court "that I placed into circulation in these proceedings two documents that are dated, signed and notarized with dates different from when the documents were actually executed." One of the two documents is the Claims Purchase Agreement. The other is a similar

---

[7] For an analysis of the claims by Market XT against E*Trade, and the claims by E*Trade against Market XT, see this Court's decision on the parties' respective motions to dismiss. *In re Market XT Holdings Corp.*, 2006 WL 2864963 (Bankr.S.D.N.Y. Sep.12, 2008).

8

"agreement" documenting the purported purchase of Amanat's personal claims against E*Trade from an affiliate, Epoch. In his letter Ashraf admitted that he had misrepresented facts relating to the documents, although he continued to insist that the documents "drafted by my counsel at Bingham McCutchen, LLP in or about January of 2005" memorialized "arrangements and agreements reached by the parties in 2003." He also asserted that he had not been present when Amanat and Amanat's brother had signed the documents on behalf of Market XT and a notary had backdated the *jurat* by almost two years.[8]

It is of no importance whether Ashraf actually saw Amanat backdate the documents. A request to an attorney "for assistance in procuring fraudulent corporate documents" provides probable cause that the attorney was retained in furtherance of a fraud or crime. *Antidote Int'l Films, Inc. v. Bloomsbury Publishing, PLC*, 242 F.R.D. 248, 250 (S.D.N.Y. 2007); *see also, In re Restaurant Development Group, Inc.*, 396 B.R. 717, 725 (Bankr. N.D. Ill. 2008). Backdating documents may be persuasive evidence of fraudulent intent. *Graham v. Comm's of Internal Revenue*, 2005 WL 730078, at *18 (Tax Ct. March 31, 2005). The fact that one of the parties was in bankruptcy makes the fraud more blatant, as backdating documents to a date prior to a bankruptcy is clear evidence of intent to defraud. *Hadar Leasing Int'l Co., Inc. v. D.H. Overmyer Telecasting Co., Inc.* (*In re D.H. Overmyer Telecasting,Co., Inc.*), 53 B.R. 963, 981 (N.D.Ohio 1984); *see also*, *U.S. v. Center*, 853 F.2d 568, 571-572 (7th Cir. 1988). It may

---

[8] Ashraf also admitted in his letter that "Of the tens of thousands of documents produced by myself and other parties in this proceeding I believe that additional documents may also contain dates different from the date which the document was actually executed." (Case No. 05-01268, ECF Doc. # 188).

also be a crime. *See* 18 U.S.C. § 152(8).[9] This appears to have been Bingham's conclusion: if the documents accurately reflect the record, Bingham dropped its representation of the EIF Parties on April 8, 2005, when its partner learned from "doing some reading in recent bankruptcy cases" that there were outstanding bankruptcy cases involving both Market XT and Amanat personally. (Doc. 3689).

Moreover, there is no reason to believe, based on the present record, that the documents submitted for *in camera* inspection merely documented transactions that actually occurred in 2003. For one thing, the documents being drafted constantly changed based on the record that it appears Ashraf wanted to create. For example, on January 16, 2005, Bingham wrote to Ashraf stating that the signatory would be changed on one document and drafted an amendment to the Epoch partnership agreement, presumably also to be backdated, and sent it to Ashraf with the comment, "We should discuss since we are pushing the envelope on this one." (Doc. 01501, dated Jan. 13, 2005). On the next day, Bingham asked, "Do you mean that we should draft the Epoch documents we do not have on the assumption that they did not otherwise exist?" (Doc. 01518). Ashraf's answer: "Yes! That's it." (Doc. 01520). At various points of time there appears to have been no pretense that the transactions at issue had ever taken place. (Doc. 01489).

One of the principal issues in the litigation by the Market XT estate against the EIF Parties involved an enormous prepayment penalty that Amanat and Ashraf had allegedly agreed to and that formed a principal basis for the claim by the EIF Parties that

---

[9] "[A]fter the filing of a case under title 11 or in contemplation thereof, [any person who] knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor…shall be fined under this title, imprisoned not more than 5 years, or both." 18 U.S.C. § 152(8).

they were entitled to retain virtually all of the $28.7 million in net proceeds from the disposition of the E*Trade stock.[10] Bingham was involved in the drafting and redrafting of numerous schedules that applied the prepayment penalty based on various scenarios, without any pretense that the payments had actually been made. For example, Ashraf wrote Bingham on January 19, 2005, about the creation of a "loan payment schedule" and asked for a "version two without the 11/26/03 one with the $250,000 and the 1/10/15 one with the $300,000." Ashraf admitted, "So I have to review which one of the following occurred: Converted all E*Trade stock into $41 million in Cash Collateral [or] Default declared, cash collateral seized upon May 2003 and a 19% per annum 4 year prepayment penalty incurred in August or October?" On February 1, 2005, Ashraf instructed, with respect to the current version of the loan repayment table, "Use the alternative 2 one herein (get rid of the 1/3/05 and the 11/26/amounts) in addition please get rid of the 5/2/03 wires (both of them)." (Doc. 02981). Bingham responded, on the same day, "Given the change in the prepayment numbers, should we recalculate the prepayment fee as well?" Ashraf replied, "Yes." (Docs. 03022-23).

As another example, Ashraf apparently wanted a solvency certificate for Market XT as of August 2003, the month when certain of the alleged fraudulent conveyances took place. Bingham inquired, "If we use the amended corp. purchase agreement, the solvency certificate would have a current date. If we use the April 23, 2003, version, the solvency certificate would be dated as of April 23, 2003. I am not sure that I understand why you would have an August 2003 solvency certificate, but maybe I am missing what

---

[10] This Court invalidated the prepayment penalty in its summary judgment opinion. *In re Market XT Holdings Corp*, 376 B.R. 390, 416-18 (Bankr.S.D.N.Y. 2007).

you are looking for here." (Doc. 01862, Jan. 20, 2005). The firm eventually provided Ashraf with the document he wanted.

As time went on, Ashraf consulted Bingham on matters that did not involve the drafting of documents. One matter involved the restatement of the EIF Parties' tax returns, which were amended to conform to the proposition that EIF had received a huge prepayment penalty in 2003. The first indication from the Bingham documents that Ashraf had consulted the firm on tax issues is a cryptic reference in an email on February 28, 2005. (Doc. 03446). Thereafter, and until the abrupt termination of the representation on April 8th, Bingham provided Ashraf with advice as to the tax treatment of the sums purportedly received from Market XT in 2003. The question is raised whether this tax advice was in furtherance of a fraud.

For the reasons explained below, Bingham's tax advice cannot be considered privileged as, apparently unbeknownst to Bingham, Ashraf was using this advice as the predicate for sending $6.7 million in escrowed funds out of the country in contempt of a court order. The history is as follows. When the Market XT estate representatives first filed their avoidance complaint against the EIF Parties on March 17, 2005, they sought and obtained a temporary restraining order against the transfer of $16 million in EIF's possession that was alleged to be traceable to funds conveyed to EIF in 2003. At the request of counsel for the EIF Parties, the TRO allowed an exception so that the EIF Parties could use some of the escrowed funds for the "payment of taxes." On May 5, 2005, Ashraf sent $6.7 million to Canada to an account of EIF's limited partner and Amanat's cousin, Samee Bhatti, assertedly to "pay" Bhatti's Canadian taxes. In a decision dated January 10, 2006, this Court found that these payments were made in

12

knowing violation of the court order, held the EIF Parties, including Ashraf, in contempt of court, and ordered that the funds be recovered.[11] There is no indication in the documents that Bingham knew anything about the TRO or the use that its tax advice would be given. However, the above course of conduct demonstrates that the advice sought from Bingham on tax matters was also used to further a fraudulent course of conduct and is not privileged.

There is one final category of documents that must be considered. Ashraf also sought Bingham's legal advice in order to formulate his best arguments that the 2003 transactions were not fraudulent conveyances and that he had provided value or reasonably equivalent value to Market XT. The question is raised whether the crime-fraud exception should apply to the communications and documents relating to this portion of Bingham's engagement. In the Second Circuit, the "crime-fraud exception has a narrow and precise application …." *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1994); s*ee also*, *In re Richard Roe*, 68 F.3d 38, 40 (2d Cir. 1995). In *Roe*, the Circuit Court rejected the District Court's reasoning that the crime-fraud exception applies to any document that reveals evidence of fraudulent or criminal activity and held that a communication must be "in furtherance" of a crime or fraud if the communication is to come within the exception. *Id.* This Court must therefore reject the position of some commentators that when "the client consults the attorney for some criminal or fraudulent purpose," the client-attorney professional relationship never comes into effect and "nothing that is said is privileged." *See* 24 A. Wright and W. Graham, Federal Practice

---

[11] *See In re Market XT Holdings Corp.*, 336 B.R. 39 (Bankr.S.D.N.Y. 2006). There never has been any substantial recovery and none at all from Bhatti, who paid no taxes in Canada and absconded with the money notwithstanding an order of arrest from a Canadian court.

13

and Procedure § 5501, pp 499-500, n. 52 (1986); *see also*, Note, The Future Crime or Tort Exception to Communications Privileges, 77 Harv.L.Rev. 730, 733 (1964).  Instead, the Court must consider each communication and document dealing with Bingham's advice on the fraudulent conveyance issue to determine whether the exception applies, even though the firm's advice was in part premised on the false documents being created.

It is therefore concluded that the crime-fraud exception does not apply to those documents in which Bingham merely provided legal advice on issues surrounding past transactions.  This conclusion is especially warranted because the attorney-client privilege is specifically intended to protect communications where a client asks a lawyer to analyze the record in a manner that would best support his position according to the lawyer's understanding of applicable law, even if the client admits prior wrongdoing.  As the Supreme Court has stated,

> courts long have viewed [the privilege's] central concern as one to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. That purpose, of course, requires that clients be free to make full disclosure to their attorneys of past wrongdoings, in order that the client may obtain the aid of persons having knowledge of the law and skilled in its practice.

*Zolin*, 491 U.S. at 562 (internal citations and quotations omitted).  It is therefore appropriate to require a close correlation between intended and not a prior wrongdoing in determining whether the crime-fraud exception applies. *Id.*[12]

---

[12] It is also likely that many of the documents that should be protected as within the attorney-client privilege also fall within the work product privilege, as the crime-fraud exception applies in the same fashion to the work-product privilege as it does to the attorney-client privilege. *In re Richard Roe*, 68 F.3d 38, 40, n. 2 (2d Cir. 1995).  Although Bingham did not apparently know of the existence of a bankruptcy or Rule 2004 examination, and it was told the advice was for "meetings," there is indication that the parties may have believed litigation to be imminent, which is all that is needed to invoke the work product privilege. Fed.R.Civ.P. 26(b)(3); *U.S. v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996), *cert. denied*, 519 U.S. 927 (1996); *Bowne of N.Y. City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 471

14

On the same basis, the crime-fraud exception is inapplicable to documents that evidence Bingham's retention of a business consultant, the Michel-Shaked Group, to assist the EIF Parties in their contention that Market XT had received "fair value" in 2003 for what it gave up. (e.g., Doc. 02977). Michel-Shaked later turned up as a declarant on the summary judgment motion in which this Court found that $13.2 million had been fraudulently transferred to the EIF Parties in 2003 and reserved decision on the remaining $15.5 million.[13] Although there are instances where the attorney-client privilege is inapplicable to communications between an attorney and a third-party consultant, there is no question that the privilege can apply when the consultant is hired to support the legal advice the client receives. *See U.S. v. Kovel*, 296 F.2d 918, 921-923 (2d Cir. 1961). Since there is no indication in the documents that Michel-Shaked was hired specifically to perpetrate a fraud or a crime, these documents should also remain confidential.

For the reasons discussed above, the Bingham documents reviewed *in camera* fall within the crime-fraud exception, except those relating to the firm's advice on the fraudulent conveyance issues and the work performed by the Michel-Shaked Group.

Documents Produced by the Firm of Mohammed Abdulla

The firm of Mohammed Abdulla, apparently a single practitioner in California, produced approximately 800 pages of documents. It is hard to tell when the professional relationship began; there are many drafts of engagement letters, but all of them are

---

(S.D.N.Y. 1993). Therefore, the Court's determination regarding the application of the exception in this opinion would be the same regardless of the privilege claimed. Indeed, the EIF Parties had counsel in the fraudulent conveyance proceedings before this Court, starting with Latham & Watkins and continuing through six successor lawyers or law firms down to the present day. There has been no suggestion that the EIF Parties should not be entitled to the attorney-client and work product privileges for communications with these counsel.

[13] The Court disregarded the declaration of the Michel-Shaked firm as it was based on wrong assumptions, did not even state an opinion and merely recounted a methodology for possibly reaching an opinion if the firm were paid for doing so. 376 B.R. at 415, n. 35.

15

undated and unsigned. It is not clear that the principal purpose of the representation was to document transactions dating from 2003. Nevertheless, the Abdulla documents also provide ample probable cause for a finding that Ashraf used him as a vehicle for the commission of a fraud or crime.

Thus the documents indicate that Abdulla had a role in the creation of documents to be backdated. In an email dated January 27, 2005, Abdulla provided advice to Ashraf regarding different alternatives for preparing the 2003 documents that Bingham was working on.[14] Abdulla's files contain copies of the false documents that Bingham prepared and that Ashraf put into circulation. (Doc. 76-99). They also contain copies of the schedules showing the alleged repayment of the Market XT "debt" to the EIF Parties and the accrual of the "prepayment penalty" as Bingham prepared and then revised the schedules. Although the documents do not show that Abdulla knew about the backdating, it is Ashraf's intent that is relevant, not Abdulla's. These are schedules that purport to reflect past events but were revised to reflect the current version of history that Ashraf wanted.[15]

There are other indications in the documents of probable cause that Ashraf hired Abdulla for the purpose of furthering a fraudulent course of conduct. For example, the documents include a copy of a purchase agreement signed by Ashraf as the manager of

---

[14] For example, Abdulla wrote that "The other option is to separate the two transactions entirely and make this an altogether different transaction that has nothing to do with EIF or Epoch altogether (see structure II)." (Doc. 49, dated Jan. 27, 2005).

[15] The Market XT estate representatives have filed an adversary proceeding against Abdulla seeking to avoid certain transfers to him, contending that he was not a good faith transferee within the meaning of § 548(c) of the Bankruptcy Code. *Nisselson v. Abdulla*, Adv. Pro. No. 06-1164 (ALG). Nothing herein is intended to prejudice Abdulla's position in that suit; however, it should be noted that there is some evidence that Abdulla knew about the bankruptcy. The amended complaint in the adversary proceeding against Abdulla asserts this, citing a letter he sent to Bank of America on March 7, 2005, in which he asked the bank to notify his office of any subpoena from the Bankruptcy Court in connection with the Market XT case. (Case No. 06-01164, ECF Doc. # 21, Ex. F).

16

Ash General Partner LLC to purchase the shares of WR BSG, Ltd. (Docs. 00063-75). WR BSG was one of the vehicles that, according to a complaint filed by the Market XT estate, was used to funnel proceeds of the 2003 transactions to a "bank" in Colorado that has since been placed in liquidation proceedings. (See Complaint in Adv. Pro. No. 05-2243). WR BSG, which was supposedly an "international business company" formed in the British Virgin Islands on December 24, 2004, defaulted in answering the complaint, and a judgment for $3.2 million was entered against it on January 26, 2007. There is also a purported subordinated loan agreement dated as of March 10, 2005, between FX Trading, Oz Corp., LLC, T-Corp., and two individuals. (Docs. 546-550). It is hard to see how this document would be privileged as to any of the EIF Parties, but there is an allegation in the record that it was part of a plan to commit a fraud. T-Corp (a/k/a T-Corp-Technologies) was a vehicle controlled by Omar Amanat's brother, Irfan Amanat, that allegedly received and transferred to the EIF Parties certain of the proceeds of the 2003 transactions in the amount of just under $1 million. (See Complaint in Adv. Pro. No. 06-1762). FX Trading was similarly used in a transfer that Amanat had engineered. (See Complaint in Adv. Pro. No. 07-1726). It is recognized that the adversary complaints identified above contain allegations that have not yet been proven, but the question is whether there is probable cause to believe there was intent to further a fraud, and there is probable cause.

The documents also indicate that Ashraf retained Abdulla as a funnel for payments to other lawyers. During the period covered by the documents, Abdulla sent wires to the following lawyers or law firms: Bingham, Engel & Reiman, John Araneo, and Brown Raysman. Whether or not any of these payments were connected to

17

fraudulent activity, the documents showing the transfers of these payments are not protected by the attorney-client privilege. An attorney cannot be used as a conduit for making payments on behalf of the client and shield the payee and the amount. *See e.g.*, *U.S. v. Hirsch (In re Grand Jury Subpoenas)*, 803 F.2d 493, 499 (9th Cir. 1986) ("The attorney-client relationship is not genuine where its only purpose is to gain confidentiality for the client or to use the lawyer as a mere conduit for the payment of money."); *In re Stein Law Firm*, 2006 WL 1305041, at *10 (D.N.M. Feb. 9, 2006) ("To the extent [the attorney's] services to the Horvaths took the form of transferring funds and facilitating transactions, they were not privileged.").[16]

Abdulla also acted as a middleman for the retention of another firm, Engel & Reiman, which was hired to set up offshore trusts for the benefit of Ashraf's family members. In addition to funneling $48,412 to Engel & Reiman, Abdulla sent a total of $1.5 million to Dr. Farooq Ashraf. Considering the timing of the creation of these trusts, in June 2005, and the fact that representatives of the Market XT bankruptcy estate had already sued Ashraf, there is probable cause to believe that this activity was designed to place Ashraf's own funds beyond the reach of his creditors and in furtherance of a fraudulent conveyance. *See, e.g., In re Grand Jury Subpoena*, 731 F.2d at 1041; *U.S. v. Barrier Industries, Inc.*, 1997 WL 16668, at *2.

## CONCLUSION

The EIF Parties' blanket claim of privilege is overruled. Consistent with the analysis set forth above, the only privileged documents are those that relate to the advice

---

[16] Document 417 also consists of a one-page schedule setting forth transfers in 2003 and 2004 from T Corp and Epoch, including millions of dollars from something called the Gallo Geffner Fenster Attorney Trust. It is unclear on what basis this document could be privileged as to the EIF Parties since it documents payments not by the EIF Parties but by the Amanat companies.

Ashraf sought and received from Bingham in connection with "meetings" on the fraudulent conveyance issues and in connection with the retention of the Michel-Shaked Group.

The EIF Parties may accordingly have a brief period to specify each document that they maintain is privileged based on the principles set forth herein. The Court will thereafter make its final ruling. In the meantime, counsel for the EIF Parties is directed to arrange for the turnover of those documents that are plainly not privileged. Counsel for the Debtors may settle an order on five days' notice.

Dated: New York, New York
       March 4, 2009

                                  */s/ Allan L. Gropper*
                                  ALLAN L. GROPPER
                                  UNITED STATES BANKRUPTCY JUDGE