| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |

------------------------------------------------------------x
In re:                                                        .
                                                              .
MARKETXT HOLDINGS CORP.,                                      .    Chapter 11
MKXT, LLC, MARKETXT, INC. AND                                 .
EPOCH INVESTMENTS, LP f/k/a                                   .    Case No. 04-12078 (ALG)
EMPYREAN INVESTMENTS, LP                                      .    (Substantively Consolidated)
                                                              .
                                    Debtor.                   .
------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

WINDELS MARX LANE
& MITTENDORF LLP
Counsel to the Responsible Officer
   By: Howard L. Simon, Esq.
       Regina Griffin, Esq.
156 West 56th Street
New York, New York 10019

THE GORDON LAW FIRM LLP
Counsel to Chimera Capital LP, Fat Boy Partners, LLC,
Gblatt, LLC & Gerstenblatt
   By: Stephen F. Gordon, Esq.
101 Federal Street
Boston, Massachusetts 02110


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion filed by Alan Nisselson, the former Chapter 11 Trustee and

the current Distribution Agent and Responsible Officer of the Debtor (the "Responsible

Officer"), for retroactive annulment of the automatic stay in the above-captioned cases.  This

relief is sought (i) to validate an outstanding arbitration award of approximately $545,526

entered against Market XT Holdings Corp. (the "Debtor") after an involuntary bankruptcy

petition was filed against it; and (ii) to reduce accordingly proofs of claim of approximately $37 million filed by Chimera Capital LP, Fat Boy Partners, LLC, Gblatt, LLC & Gerstenblatt (the "Claimants"). The Claimants oppose the motion.

For the reasons set forth below, the Responsible Officer's motion is granted, and the claims filed by the Claimants are reduced.

## BACKGROUND

The relevant facts are undisputed. The Debtor, and its wholly-owned subsidiary, Momentum Securities, LLC ("Momentum"), provided electronic trading services to the Claimants' day-trading business through an Exclusive Trading Agreement (the "Agreement"), which required the Debtor and Momentum to offer the Claimants business terms that were at least as good as those offered to other customers. The Agreement also required the parties to arbitrate disputes through the National Association of Securities Dealers (the "NASD") in New York City.

In April 2002, the Claimants commenced an NASD arbitration against the Debtor (then sometimes known as Tradescape) and Momentum, contending that at least one other customer had received better terms and that the difference in terms amounted to approximately $3.4 million. The Claimants' NASD Statement of Claim included, among other things, a demand for the production of all documents revealing the business terms offered to Tanzman, Rock, and Kaban ("TRK"). (*See* ECF Doc. No. 1566, Exh. 2.) In June 2002, E*Trade Financial Corp. ("E*Trade") acquired Momentum, and the Claimants subsequently added E*Trade as a party to the arbitration. During the arbitration discovery process, the Claimants requested information and documents about business terms offered to other customers. Counsel for the Debtor (who was no longer counsel for Momentum) responded by letter, stating that his client had no

2

documents responsive to the Claimants' discovery requests, and that "such documents, if they exist at all, are likely in the possession of Momentum Securities." (ECF Doc. No. 1655, Exh. 1.) The Claimants then filed a motion with the arbitrators to compel production of the documents, which was granted. As for the Debtor, counsel maintained its previous position and produced no documents.

Arbitration hearings began in early June 2003, with at least six witnesses testifying. A former employee of the Debtor, who was at the time an employee of Momentum, testified at length about the business terms offered to TRK. *See, e.g.*, NASD Tr. 795:13-797:25, June 5, 2003, (ECF Doc. No. 1661, Exh. E.) During the arbitration, the Claimants also obtained documentary evidence concerning the business terms offered to TRK, as admitted by the Claimants' principal, Jared Gerstenblatt. *See* NASD Tr. 477:12-480:9; 488:19-489:2, June 2, 2003, (ECF Doc. No. 1661, Exh. D). NASD hearing remarks of E*Trade's counsel also referred to the documentary evidence produced at the time of the hearings:

> COUNSEL: I can just illustrate this, Mr. Chairman, [TRK's] current deal. [TRK] runs a group. We produced the documents this morning, we produced some of them before . . . . All I am saying, Mr. Chairman, is that once we learned their focus, we produced the broker agreements that were the subject of their focus. There were lots of brokers . . . who have lots of agreements that are like, in some sense, [TRK's] . . . and we produced, when we knew the focus, [TRK's] and we produced Mr. Miller's. That's all. The other broker agreements, we have not produced them.

(NASD Tr. 234:18-236:17, June 2, 2003, ECF Doc. No 1661, Exh. B.) The NASD also authorized the Claimants to issue additional subpoenas to third-party customers, including the principal of TRK, to testify and to produce documents at the arbitration hearing, including among other things, copies of the agreements between TRK, the Debtor and/or Momentum.

In September 2003, during a hiatus in the arbitration proceedings, the Claimants settled their claims against E*Trade/Momentum, and the arbitration continued against the Debtor alone

3

with two additional days of hearings in September and October. The Claimants did not call any representative of TRK to testify at the hearings. The matter was then taken under advisement by the arbitration panel on or about October 20, 2003.

On March 26, 2004, an involuntary Chapter 7 bankruptcy case was commenced against the Debtor.[1] A month-and-a-half later, apparently without notice of the bankruptcy filing, the NASD rendered a decision in favor of the Claimants in the aggregate amount of $545,526, plus interest.[2]

In July 2005, the Claimants filed proofs of claim 95, 96, 97 and 98 against the Debtor, stating that the claims were based on the breach of the Agreement that had been the subject of the NASD arbitration. The Claimants also assert that during the course of the Debtor's bankruptcy, documents were discovered that show that TRK had been granted better business terms than those established in the arbitration proceedings. The Claimants argue that their damages were approximately $37 million, rather than $545,526, as the arbitrators found.

The Responsible Officer objected, arguing among other things, that the NASD award was preclusive as to the Claimants' claims. The Claimants replied that "since the issuance of the Arbitration Award was subsequent to the commencement of this bankruptcy case, it was issued in violation of the automatic stay and is null and void and has no force or effect and cannot be the basis of any issue preclusion doctrine." (Claimants' Mot. in Response to Claim Objection, ¶ 16, ECF Doc. No. 1526.) The Responsible Officer countered with the present motion for retroactive annulment of the automatic stay, which the Claimants oppose, arguing that retroactive annulment is not legally warranted, and, in the alternative, that the NASD award was procured

---

[1] The case was converted to a voluntary Chapter 11 in December 2004. The Chapter 11 estates of Market XT and the above-captioned debtors have been substantively consolidated, and a liquidating Chapter 11 plan has been confirmed.

[2] The Claimants estimate that the outstanding award with interest is approximately $630,000.

4

by fraudulent conduct and should be vacated under § 10 of the Federal Arbitration Act, 9 U.S.C. § 10.

## DISCUSSION

*Retroactive Annulment of the Automatic Stay*

Section 362 of the Bankruptcy Code automatically stays the "commencement or continuation . . . of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title . . . ." "Congress intended the stay to afford Debtor breathing room and to assure creditors of equitable distribution." *In re Soares* 107 F.3d 969, 977 (1st Cir. 1997), citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97. For this reason, "any proceedings or actions described in section 362(a)(1) are void and without vitality if they occur after the automatic stay takes effect." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994); *Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc.,* 157 F.3d 169, 172 (2d Cir. 1998).[3] This includes the issuance of an arbitration award. *See Savers Fed. Savs. & Loan Ass'n v. McCarthy Constr. Co.* (*In re Knightsbridge Dev. Co.*), 884 F.2d 145, 148-49 (4th Cir. 1989); *Ellison v. Northwest Eng'g Co.,* 707 F.2d 1310, 1311 (11th Cir. 1983). Contrary to the Responsible Officer's contention, there is no exception that would permit the Court to treat the award as final because the dispute had been fully submitted for decision when the bankruptcy petition was filed, or to treat the issuance of the arbitrators' decision as a ministerial act.

---

[3] There is a split of authority as to whether an act in violation of the automatic stay is void or voidable. For the proposition that the act is voidable see the following cases: *Bronson v. United States,* 46 F.3d 1573, 1577 (Fed.Cir.1995); *In re Jones,* 63 F.3d 411 (4th Cir.1995), *cert. denied,* 517 U.S. 1167, 116 S.Ct. 1566, 134 L.Ed.2d 666 (1996); *Easley v. Pettibone Michigan Corp.,* 990 F.2d 905, 909-911 (6th Cir.1993); *Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178-179 (5th Cir.1989). *Compare with Kalb v. Feuerstein,* 308 U.S. 433, 438 (1940); *In re Schwartz,* 954 F.2d 569, 573 (9th Cir.1992); *Borg-Warner Acceptance Corp. v. Hall,* 685 F.2d 1306, 1308 (11th Cir.1982). As stated above, the Second Circuit adheres to the view that stay violations are void. *Eastern Refractories,* 157 F.3d at 172; *Rexnord,* 21 F.3d at 527. This approach "places the burden of validating the actions after the fact squarely on the shoulders of the offending creditors . . . [and] harmonizes with the nature of the automatic stay and the important purposes that it serves." *In re Soares*, 107 F.3d at 976.

5

*Compare Rexnord*, 21 F. 3d at 527-28; *with In re Best Payphones*, 279 B.R. 92, 98 (Bankr.S.D.N.Y. 2002).

In this case it thus cannot be disputed that the automatic stay became effective upon the petition date and that the NASD award was null and void under Second Circuit law. Under these circumstances, the appropriate relief available to the Responsible Officer is the retroactive annulment of the automatic stay. *See In re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir. 1984). Section 362(d) of the Bankruptcy Code provides that "after notice and a hearing the court shall grant relief from the stay" by among other things, annulling the stay for cause. 11 U.S.C. § 362(d)(1). Retroactive annulment of the automatic stay "operates retroactively to the date of the filing of the petition . . . and thus validate[s] actions taken by the party at a time when he may have been unaware of the existence of the stay." *Albany Partners, Ltd.*, 749 F.2d at 675; *In re Best Payphones*, 279 B.R. at 98. Courts use a case-by-case test to determine when retroactive annulment of the stay is appropriate. *See In re WorldCom*, 325 B.R. 511, 521 (Bankr.S.D.N.Y. 2005).

In *In re Stockwell,* 262 B.R. 275, 281 (Bankr.D.Vt. 2001), the Court provided a non-exclusive, disjunctive list of the reasons that courts have used for granting retroactive annulment of the automatic stay:

> (1) if the creditor had actual or constructive knowledge of the bankruptcy filing and, therefore, of the stay, (2) if the debtor has acted in bad faith, (3) if there was equity in the property of the estate, (4) if the property was necessary for an effective reorganization, (5) if grounds for relief from the stay existed and a motion, if filed, would likely have been granted prior to the automatic stay violation, (6) if failure to grant retroactive relief would cause unnecessary expense to the creditor, and (7) if the creditor has detrimentally changed its position on the basis of the action taken.

(internal quotation and citations omitted). Even though these so-called *Stockwell* factors have been developed from cases in which creditors, rather than the debtor, have sought annulment of

6

the automatic stay, the factors are premised on core bankruptcy policies that are applicable to annulment cases in general and illustrate how courts "balance the equities between the parties." *Kemper Insurance Co. v. Profile Systems, Inc. (In re Profile Systems, Inc.)*, 193 B.R. 507, 512 (Bankr.D.Minn. 1996). It is recognized that the important policy objectives advanced by the automatic stay require that courts exercise discretion to annul the stay sparingly, and only when the moving party has met its burden of showing cause. *See Soares*, 107 F.3d at 976-77.

In the instant case, the most relevant *Stockwell* factors are 5 and 6, as both parties contend in their pleadings.[4] Stockwell factor 5 considers whether there were grounds for granting relief from the stay prior to the automatic stay violation. In the Second Circuit, this requires analysis of the so-called *Sonnax* factors that are commonly used to determine whether a motion to lift the automatic stay should be granted to permit litigation to proceed in another forum. *See In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286-88 (2d Cir. 1990). The following *Sonnax* factors are relevant here: (i) whether a specialized tribunal with expertise would hear and adjudicate the dispute; (ii) whether referral of the case would interfere with the proceedings in the bankruptcy case or with the debtor's estate; (iii) whether lifting the stay would result in partial or complete resolution of the issues; and (iv) whether the interests of judicial economy would be advanced by referral.[5] In the instant case, it is undisputed that *Sonnax* factors (i), (ii) and (iii) support lifting the stay. As to factor (iv), suffice it to say that the arbitration process continued for more than a

---

[4] Factor 1 does not apply because there was no real fault in the stay violation at issue. As to factors 2, 3 and 4, there is no claim that the Debtor acted in bad faith with respect to the automatic stay, and there is no issue as to whether the Debtor had equity in property or whether property was needed for an effective reorganization. Factor 7 is also inapplicable, as it cannot be said that the Claimants have detrimentally changed their position based on the NASD award.

[5] The other *Sonnax* factors are: (i) whether the debtor's insurer has assumed full responsibility for defending the suit; (ii) whether the action primarily involves third parties; (iii) whether litigation in another forum would prejudice the interests of other creditors; (iv) whether the judgment claim arising from the other action is subject to equitable subordination; (v) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (vi) impact of the stay on the parties and the balance of harms. 907 F.2d at 1286.

7

year and encompassed the testimony of at least six witnesses over six days of hearings, followed by months of deliberation by the NASD arbitrators. The Claimants do not and cannot dispute that the parties and the NASD panel spent a significant amount of time, effort, and resources in the arbitration process and that the principle of judicial economy would favor validation of the arbitration proceedings. *See, e.g., In re G.S. Distribution, Inc.*, 331 B.R. 552, 566-67 (Bankr.S.D.N.Y. 2005); *In re Carroll's Wine Company*, 332 B.R. 874, 876 (Bankr. N.D. Iowa 2005); *In re Mid-Atlantic Handling Systems, LLC*, 304 B.R. 111, 113 (Bankr.D.N.J. 2003). Accordingly, *Stockwell* factor 5 under the circumstances of this case strongly supports the retroactive annulment of the stay.

*Stockwell* factor 6 also militates in favor of the annulment of the automatic stay. This factor considers the expense that would be incurred if the automatic stay were not annulled. In this case, the reopening of the parties' dispute would require new proceedings, which would be challenging and expensive due to the time that has elapsed since the rendering of the award, the bankruptcy filing of the Debtor, and its subsequent liquidation. Securing the testimony of witnesses would also be challenging since the Debtor's principals are no longer associated with the Debtor, and the Debtor has no control over Momentum or its documents or employees. To open the whole process again would in effect allow the Claimants to employ the automatic stay as a shield to attack a result that they apparently now find unfavorable. *Job v. Calder (In re Calder)*, 907 F.2d 953, 956-57 (10th Cir. 1990) (to "permit the automatic stay provision to be used as a trump card played after an unfavorable result was reached in state court, would be inconsistent with the underlying purpose of the automatic stay, which is to give a debtor 'a breathing spell from his creditors.'"); *see also In re Pulley*, 196 B.R. 502, 504 (Bankr.W.D.Ark. 1996).

For the forgoing reasons, the motion for retroactive annulment of the automatic stay is granted.

***The NASD Award Need Not Be Vacated Due to "Fraud"***

As stated above, the Claimants argue in the alternative that the Debtor knowingly withheld documents that would have undermined its case at the NASD, and that under § 10 of the Federal Arbitration Act this constitutes fraud and requires the award to be vacated. This argument is without merit.

"The purpose of arbitration is to permit a relatively quick and inexpensive resolution of contractual disputes by avoiding the expense and delay of extended court proceedings." *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir. 1980)*; see also Office of Supply v. New York Navigation Co.*, 469 F.2d 377, 379 (2d. Cir. 1972). Accordingly, "it is the Second Circuit's policy to read very narrowly courts' authority to vacate arbitration awards. . . ." *Blue Tee Corp. v. Koehring Co.*, 754 F.Supp. 26, 31 (S.D.N.Y. 1990), *citing John T. Brady & Co. v. Form-Eze Systems, Inc.*, 623 F.2d 261, 263 (2d Cir. 1980). Although an arbitration award procured by fraud or undue means may be vacated or modified by a federal court, a party seeking such relief must show by clear and convincing evidence the following three factors: (1) the existence of fraud; (2) that it was impossible to discover the fraud by due diligence prior to or during the arbitration proceedings; and (3) that there exists a material relation between the alleged fraud and the issues in the arbitration. *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir. 1982). In the instant case, assuming *arguendo* that withholding information about TRK constituted fraud, Claimants would have to show that they could not have discovered the facts during the course of the arbitration.

9

This they cannot establish. Failure to use available discovery processes prior to or during the arbitration is fatal to claims under § 10 of the Federal Arbitration Act. In *Karppinen v. Karl Kiefer Mach. Co.*, 187 F.2d 32, 35 (2d Cir. 1951), the Court required a party seeking to vacate an arbitral award on grounds of fraud to establish that it "could not have discovered [the fraud] during the arbitration." 187 F.2d at 35. In *Biotronik Mess-Und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F.Supp. 133, 138 (D.N.J. 1976), enforcement of an award was opposed on the ground that the prevailing party had knowingly withheld evidence that would have undermined its case. Relying on *Karppinen*, the District Court rejected the argument and stated that "[w]hile fraud may arise from an omission of material fact as well as an affirmative statement," the dispositive inquiry is "whether the protesting party had an opportunity to discover and reveal the purported fraud at the arbitration hearing." 415 F.Supp. at 138. Similarly, in *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306-07 (5th Cir. 2004), the Fifth Circuit refused to vacate an allegedly fraudulent award because the information underlying the dispute was not solely within the opposing party's control and "[t]he Tribunal gave [the losing party] an opportunity to pursue discovery requests, which it declined." *See also Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310, 313 (7th Cir. 1981); *Catz American Co. v. Pearl Grange Fruit Exchange Inc.*, 292 F.Supp. 549, 553 (S.D.N.Y. 1968); *Dean v. Painewebber Inc.*, 1992 WL 309606, *1 (S.D.N.Y. Oct. 14, 1992).

In the case at bar, the record before the Court demonstrates that the Claimants had ample opportunity prior to and at the NASD hearings to discover the facts relating to TRK. First, the Claimants were well aware of the possibility that the Debtor had offered better terms to TRK in that the NASD arbitration had been commenced, in part, on that premise. This is confirmed by

10

the Claimants' Statement of Claim, the testimony of the Claimants' principal at the hearings, and the remarks of E*Trade's counsel. In any event, the Claimants sought and were granted authority to subpoena representatives of TRK to testify at the NASD hearings and to produce copies of the agreements between TRK, the Debtor and Momentum. The Claimants have provided no explanation as to why they failed to pursue the discovery available to them.

Second, the record also shows that E*Trade, on behalf of Momentum, provided the Claimants with documents evidencing the business terms offered to TRK and that at the NASD hearings the Claimants had the opportunity to examine a former employee of the Debtor, who had extensive and detailed knowledge about the business terms offered to TRK. The Claimants contend that the information received from E*Trade left 35 of the Debtor's customers unidentified, including "TZMAC" and "TROCK," which the Claimants believe were TRK entities. Even if this were the case, the fact is that the Debtor was not the only party with information about the business terms offered to third parties. Indeed, there is evidence on the record that Momentum was the operating company and had far more effective control than the Debtor, its parent, over documents and evidence.

Since the award cannot be vacated for "fraud," the Court is not free to ignore or to reconsider it. In *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 264, 266 (2d Cir. 1997), the Second Circuit held that an arbitration award was entitled to *res judicata* treatment by the district court and, applying New York law, that an arbitration award need not be confirmed in court to have preclusive effect. 111 F.3d at 266-67. "Under the doctrine of *res judicata*, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, n. 5 (1979). *Res judicata* as well as the related doctrine of collateral estoppel "has the dual purpose

11

of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane*, 439 U.S. at 326.

The doctrine of *res judicata* applies in bankruptcy court and under the facts of this case. *Kelleran v. Andrijevic*, 825 F.2d 692, 694 (2d Cir. 1987). The Claimants are the same parties involved in the NASD arbitration, and their proofs of claim are based on the same cause of action arbitrated at the NASD. See, for example, the supporting documents the Claimants have attached to their proofs of claims, which state that their bankruptcy claims are based on the alleged breaches of the Agreement that were arbitrated. (ECF Doc. No. 1566, Exh. 7.) It is also undisputed that there were evidentiary hearings over six days on the Claimants' claims, and the NASD issued an award on the merits. That award fixed Claimants' claims in this case at $545,526, plus interest.

## CONCLUSION

The Responsible Officer is directed to settle an order limiting the Claimants' proofs of claim to the amounts awarded in the NASD arbitration, plus applicable prepetition interest. The notice of settlement should include a calculation of interest, to which Claimants may respond.

Dated: New York, New York
       July 20, 2009

                                        */s/ Allan L. Gropper*
                                        UNITED STATES BANKRUPTCY JUDGE